**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DEPARTMENT OF LABOR & INDUSTRIES, | No. 56929-9-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| A PLACE FOR ROVER INC., DBA PLACE FOR ROVER A INC., | |
| Respondent. | |

MAXA, J. – The Department of Labor and Industries (DLI) appeals the superior court's order denying DLI's petition for review of a decision and order by the Board of Industrial Insurance Appeals (the Board). The Board ruled that A Place for Rover, Inc. (Rover), which operates an online platform that facilitates pet service providers entering into agreements with pet owners to provide services, is not an "employer" of the pet service providers and that the pet service providers were not "workers" under the Industrial Insurance Act (IIA), title 51 RCW. Therefore, the Board concluded that Rover was not required to pay industrial insurance premiums.

Former RCW 51.08.180 (2008) defines "worker" to include any person "who is working under an independent contract, the essence of which is his or her personal labor for an employer under this title." Former RCW 51.08.070 (2008) defines "employer" to include any person "who contracts with one of more workers, the essence of which is the personal labor of such worker or workers."

No. 56929-9-II

Rover operates a website and mobile application that allows pet owners to locate and communicate directly with pet service providers who offer a variety of pet-related services. In order to use the online platform, both pet service providers and pet owners must agree to Rover's terms of service (TOS). The service providers and pet owners then negotiate the terms of agreements for services without any involvement of Rover.

The pet service providers set their own rates, what type of services they provide, what hours they work, cancellation policies and other details, and what pet owners they will work with. After the service is scheduled, the pet owner transmits the agreed fee to Rover. Rover retains a percentage of the fee and transfers the remainder to the pet service provider.

DLI conducted an audit and determined that Rover should have been paying industrial insurance premiums under the IIA because Rover was an "employer" and the pet service providers were "workers" under the statutory definitions. On appeal, the Board ruled that Rover was not subject to the IIA because the pet service providers were not "workers" and entered findings of fact supporting that ruling. The superior court denied DLI's petition for review and affirmed the Board's decision.

We hold that the pet service providers did not fall within the statutory definition of "worker" because they were not "working under an independent contract" with Rover. Former RCW 51.08.180. Accordingly, we affirm the Board's decision and order.

FACTS

*Background*

Rover provides an online platform where pet owners can locate pet service providers who provide services for pets and request bookings from the providers. Pet owners and care

2

No. 56929-9-II

providers can access the platform through a desktop web application, mobile app, and other tools.

If pet service providers want to post a profile on the Rover platform, they must apply. In addition, pet service providers must submit to a criminal background check through a third party before they are able to post a profile. The purpose of the background check is to ensure the providers do not have a history of dangerous behavior toward people or animals. Other than an initial limited review of applications, Rover does not evaluate the suitability of pet service providers. But Rover reserves the right to suspend or terminate access to its platform based on the information in the background check or for any other reason, in its sole discretion.

Once their application is accepted, a pet service provider posts a profile that provides information regarding the types of services they provide, the animals they will work with, and their prices. If a pet owner wants to locate a service provider, they can go to the platform and conduct a search for providers that offer the service they need. Through the platform, the pet owner can send a message to the provider, conduct a conversation, book the service, and pay for the service.

Rover is not involved in the booking process. The pet service providers set their own rates, the types of services they provide, the types of animals they will work with, where the service is performed, the hours they work, and cancellation policies and other details. The providers also decide whether to work for a particular pet owner. In addition, Rover does not require that pet service providers use only its platform to market their services.

In order for both pet owners and pet service providers to access and use Rover's platform, they must agree to Rover's TOS. The TOS states that the terms constitute a binding legal agreement between the user and Rover. Further, "[t]he Terms govern your use of our software

3

No. 56929-9-II

applications, resources and services for pet owners and pet service providers to find each other, communicate with each other, and arrange for the provision of pet service services." Administrative Record (AR) at 1326.

The TOS states that Rover does not provide pet care services and does not "employ, recommend or endorse" pet service providers or pet owners. AR at 1326. Instead, Rover provides "a neutral venue" for pet service providers and pet owners. AR at 1326. The TOS states that although Rover's platform may be used to offer and find pet care services, all transactions are between the pet owners and the pet service providers. And the pet owners are solely responsible for evaluating the suitability of the pet service providers.

The TOS provides that both a pet service provider and a pet owner can agree to a booking that specifies the fees, time period, and other terms. By completing a booking, both parties agree to honor the price and other terms. The purchase of pet care services is a transaction between the pet owner and the pet service provider. The pet service provider, not Rover, is responsible for performing the agreed services.

The TOS states that "Rover's role is to facilitate payments from Pet Owners to Service Providers as limited payment agent for the Service Provider." AR at 1331. Rover collects the agreed fee from the pet owner at the time the booking is made. Rover agrees to remit payment to the pet service provider within 48 hours after completion of the service period. But Rover first deducts a service fee, which is calculated as a percentage of the fees paid by the pet owner. Typically, the service fee is 25 percent of the fees paid by the pet owner.

Rover's only involvement with the provision of services is when pet service providers cancel near the start of the service period. In that event, the TOS states that Rover will use all reasonable efforts to find a replacement provider and will pay the cost difference between the

4

No. 56929-9-II

original booking and the new booking up to 25 percent of the total cost. Rover also may become involved if a pet owner fails to retrieve their pet at the end of the service period.

The TOS also contains a provision regarding substandard services:

> If we determine in our reasonable discretion that a Service Provider has failed to provide Pet Care Services as agreed with the Pet Owner or otherwise in accordance with these Terms then we may, in our reasonable discretion, cancel a Booking and/or issue a full or partial refund to a Pet Owner.

AR at 1333.

The TOS contains a list of prohibited conduct regarding the use of its platform. For example, users agree not to post materials that are "pornographic, threatening, harassing, abusive, or defamatory, or that contain nudity or graphic violence, [or] incite violence." AR at 1329. And users cannot provide false information on profiles or registrations. Rover reserves the right to suspend or terminate access to its platform if a user's conduct is inappropriate, unsafe or violates the code of conduct or for any other reason.

The closing paragraph of the TOS states, "Nothing in this Agreement will be construed as making either party the partner, joint venturer, agent, legal representative, employer, contractor or employee of the other." AR at 1340.

Rover does not provide any reviews or evaluations of pet service providers. However, Rover collects GPS data when a pet service provider takes a dog for a walk. Rover provides pet owners with information where their pet went and how long the walk was.

Rover hires contractors – office workers – to provide support for its platform. These contractors perform services for Rover. For those people, Rover uses an independent contractor agreement. Such an agreement is not used for pet service providers or pet owners who use the Rover platform.

5

No. 56929-9-II

*DLI Audit and Rover Appeal*

In 2017, DLI received three workers' compensation claims from pet service providers who posted on the Rover platform. DLI assigned an auditor to investigate whether the pet service providers were Rover's workers. As part of the audit, DLI sent out 169 independent contractor questionnaires to various pet service providers and received over 50 responses.

The auditor determined that the pet service workers using Rover's online platform were covered workers and subject to industrial insurance coverage. As a result, DLI ordered Rover to pay an assessment of $219,947.75 in industrial insurance taxes and fines.[1]

Rover appealed the assessment. An industrial appeals judge (IAJ) conducted a hearing considering testimony from several witnesses and multiple exhibits. The IAJ issued a proposed decision and order that reversed DLI's assessment.

DLI filed a petition for review with the Board, asking the Board to disregard the proposed decision and affirm its assessment. The Board agreed with the IAJ's proposed decision and order and reversed the assessment order.

The Board noted that Rover had virtually no control over the pet owners or pet service providers other than receiving payment and subtracting a fee for its services and the right to suspend or terminate use of its site. The Board stated that "Rover does not control the what, when, who, or how" pet services are provided and does not warrant the qualifications of the pet service providers. AR at 5. And the pet service providers who provided testimony did not state that they had consented to any form of employment agreement.

---

[1] The assessment included industrial insurance taxes for 17 people who signed separate independent contractor agreement to perform services for Rover. Rover did not contest these taxes on appeal.

6

No. 56929-9-II

The Board then considered whether the essence of the contract between Rover and the pet service providers was personal labor for Rover. The Board stated,

> Here, the pet service providers are not working or providing their services for Rover under a contract with Rover. The providers provide work under an agreement with the pet owners and provide the work for the pet owners. Rover is not involved in setting price, time, scope of service, or any other matter relating to the provider's and owner's agreement. The essence of the contract between Rover and the pet service provider is the use of Rover's online platform in exchange for a fee, not the personal labor of the pet service provider.

AR at 6.

The Board issued findings of fact and conclusions of law, and concluded that "A Place for Rover, Inc. is not an employer of pet services providers and the pet service providers are not workers of A Place for Rover, Inc. within the meaning of RCW 51.08.070 and RCW 51.08.180, respectively." AR at 8.

One Board member dissented. The dissent concluded that "[t]he service providers for Rover are working under an independent contact, the essence of which is their personal labor." AR at 11. Therefore, the dissenting member would have affirmed DLI's assessment order.

*DLI Petition for Review*

DLI filed a petition for review of the Board's decision and order in the superior court. The superior court denied DLI's petition for review and affirmed the Board's decision. Specifically, the court found that the Board's findings were supported by substantial evidence and that the TOS were not a contract for personal labor. DLI filed a motion for reconsideration. The court granted the motion in part to clarify the proper applicable statutes, but reaffirmed its order denying the petition for review.

DLI appeals the superior court's order affirming the Board's decision and order.

7

No. 56929-9-II

ANALYSIS

A.     STANDARD OF REVIEW

The Administrative Procedures Act (APA), chapter 34.05 RCW, governs judicial review of the Board's decision regarding an assessment of industrial insurance premiums. RCW 51.48.131; *Dep't of Labor & Indus. v. Lyons Enter. Inc.*, 185 Wn.2d 721, 731, 374 P.3d 1097 (2016). Under the APA, on appeal we review the agency order based on the administrative record before the Board. *Lyons Enter.*, 185 Wn.2d at 731.

The APA provides nine grounds for reversing an administrative order. RCW 34.05.570(3). Two grounds potentially are applicable here: (1) substantial evidence does not support the order, RCW 34.05.570(3)(e), and (2) the agency erroneously interpreted or applied the law, RCW 34.05.570(3)(d). We review the Board's findings of fact under a substantial evidence standard, considering whether the record contains evidence sufficient to persuade a fair-minded, rational person that the finding is true. *Lyons Enter.*, 185 Wn.2d at 731. We review de novo the Board's legal conclusions, giving substantial weight to the agency's interpretation. *Id.* at 731-32.

B.     "WORKERS" UNDER RCW 51.08.180

DLI argues that the Board erred in ruling that pet service providers who use Rover's platform are not Rover's "workers" as defined in RCW 51.08.180. We disagree.

1.     Legal Principles

Every "worker" injured in the course of their employment is entitled to receive workers' compensation benefits. RCW 51.32.010. And every employer of a worker must pay workers' compensation premiums. RCW 51.16.060. A finding that an entity employs "workers" is a prerequisite to the imposition of such premiums. *Lyons Enter.*, 185 Wn.2d at 734.

8

No. 56929-9-II

a.    Statutory Definition

Former RCW 51.08.180 defines "worker" to include any person "who is working under an independent contract, the essence of which is his or her personal labor for an employer under this title." Former RCW 51.08.070 defines "employer" to include any person "who contracts with one of more workers, the essence of which is the personal labor of such worker or workers."

Applying the statutory definitions of "worker" and "employer" requires this court to decide whether (1) the alleged worker was working under an independent contract, (2) the essence of the contact was personal labor, and (3) the personal labor was for the alleged employer. *Dana's Housekeeping Inc. v. Dep't of Labor & Indus.*, 76 Wn. App. 600, 607, 886 P.2d 1147 (1995); *see also Lyons Enter.*, 185 Wn.2d at 738.

The "essence" of the contract refers to the " 'gist or substance, the vital sine qua non, the very heart and soul' of the contract between the independent contractor and the employer." *Lyons Enter.*, 185 Wn.2d at 735 (quoting *Lloyd's of Yakima Floor Ctr. v. Dep't of Labor & Indus.*, 33 Wn. App. 745, 751, 662 P.2d 391 (1982)). To determine whether the essence of the contract is personal labor, we examine the contract itself, the work to be performed under the contract, the parties' situation, and other circumstances. *Lyons Enter.*, 185 Wn.2d at 735. Rather than focusing on the technical elements of the test, we focus on the reality of the situation. *Id*. at 736.

One test for determining when personal labor is *not* the essence of the contract was stated in *White v. Department of Labor & Industries*, 48 Wn.2d 470, 294 P.2d 650 (1956). *See Delivery Express, Inc. v. Dep't of Labor & Indus.*, 9 Wn. App. 2d 131, 139, 442 P.2d 637 (2019). The test set out three factors in making this determination: (1) whether the contractor performs the contract using tools or machinery they own or supply, (2) whether the contractor needs

9

No. 56929-9-II

assistance to perform the contract, and (3) if the contractor chooses to or must hire others to perform the contracted work. *Id.* at 139-40.

How the parties characterize a contract is not determinative of whether a contractor is a "worker." *Lyons Enter.*, 185 Wn.2d at 738-39. RCW 51.04.060 states, "No employer or worker shall exempt himself or herself from the burden or waive the benefits of this title by any contract."

b.      Standard of Review

Rover argues that whether the pet service providers were "workers" is a question of fact that must be reviewed under a substantial evidence standard. However, this court has held that whether a contractor is a worker is a mixed question of law and fact. *B & R Sales Inc. v. Dep't of Labor & Indus.*, 186 Wn. App. 367, 376, 344 P.3d 741 (2015). We review for substantial evidence the nature of the applicable contracts, the services the contractors provided, and other related issues. *Id.* But whether contractors are "workers" based on those facts depends on the interpretation of former RCW 51.08.180, which we review de novo. *Id.*

Our analysis must account for RCW 51.12.010, which states that the IIA "shall be liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." Under this statute, we must construe the IIA " 'in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker.' " *Bradley v. City of Olympia*, 19 Wn. App. 2d 968, 978, 498 P.3d 562 (2021) (*quoting Spivey v. City of Bellevue*, 187 Wn.2d 716, 735, 389 P.3d 504 (2017)).

10

No. 56929-9-II

   2.    Applicable Cases

The parties focus on three cases involving relationships somewhat similar to the one in this case: *Dana's Housekeeping*, 76 Wn. App 600; *Lyons Enterprises*, 185 Wn.2d 721; and *Cascade Nursing Services, LTD v. Department of Employment Security*, 71 Wn. App. 23, 856 P.2d 421 (1993).

       a.    *Dana's Housekeeping*

In *Dana's Housekeeping*, Dana's clients/customers were homeowners. 76 Wn. App. at 603. Dana's contracted with housecleaners to clean its customers' houses, characterizing them as independent contractors. *Id.* at 602. Dana's assigned housecleaners to specific jobs and made all the arrangements for them to clean the houses, including determining the amount charged for the service. *Id.* at 602-03. While housecleaners could decline jobs, Dana's warned that they probably would be terminated if they did so. *Id.* at 602. Dana's instructed housecleaners on specific cleaning methods and prohibited certain conduct on the job. *Id.* at 603.

Dana's did not dispute that the housecleaners were working under independent contracts, so the court addressed only "the essence of the work and for whom the work is performed." *Id.* at 607.

The court first affirmed the Board's finding that personal labor was the essence of the contract. *Id.* at 607-08. The court stated, "Dana's claims the essence of its relationship with the housecleaners is 'an agreement to accept referrals and share a fee'. But the 'essence' with which the statute is concerned is the essence of the *work* under the independent contract, not the characterization of the parties' relationship." *Id.* at 607. The Board found that housecleaning

11

No. 56929-9-II

was personal labor, and the court agreed.[2]  *Id.* at 608.  The court disregarded the fact that the

contracts stated that the essence was the solicitation of housecleaning assignments.  *Id.*

The court then concluded that the personal labor was "for" Dana's.  *Id.* at 608-09.  The

court stated,

> Dana's claims the housecleaner's personal labor was not *for* Dana's because the
> homeowner is the recipient of the house cleaning.  Dana's claims the relationship
> involving personal labor is between the housecleaners as sole proprietors and the
> homeowners.  Personal labor "for the employer," however, includes both direct
> labor for Dana's and labor for Dana's benefit.  If the realities demonstrate the labor
> is for Dana's benefit, the existence of a third party customer does not place the
> worker outside the scope of industrial insurance coverage.
> . . . .
>
> . . . Dana's received a continuing benefit from its contract with the housecleaners –
> up to 48 percent of the cleaning fee paid by homeowners.  Dana's intensely
> controlled scope, manner, quality, and by whom the work was performed. Dana's
> accepted the risk of nonpayment.  There is evidence in sufficient quantum to
> persuade us that personal labor was performed for Dana's; the existence of
> homeowners as end recipients of the cleaning service does not change the reality
> that the housecleaner's labor was for Dana's benefit.

*Id.* at 608-09 (citation omitted).

b.   *Lyons Enterprises*

In *Lyons Enterprises*, Lyons was a regional franchisor of a janitorial franchise that

entered into franchise agreements with franchisees.  185 Wn.2d at 727.  Lyons entered into

cleaning contracts with customers and offered the accounts to its franchisees.  *Id.*  On each

contract, the franchise was required to pay Lyons royalty and management fees.  *Id.*  And the

contract remained Lyons' property, as did any new contracts the franchisees obtained.  *Id.*

Franchisees were prohibited from providing commercial cleaning services outside of the

---

[2] The court in *Dana's Housekeeping* concluded that whether personal labor is the essence of a
contract is a factual determination, and applied a substantial evidence standard.  76 Wn. App. at
608.  This court rejected this approach in favor of de novo review in *B&R Sales*, 186 Wn. App.
at 376.

12

No. 56929-9-II

franchise agreement. *Id.* at 728. Lyons reserved the right to remove a franchisee from a cleaning contract for any reason. *Id.*

As in *Dana's Housekeeping*, Lyons did not dispute that the franchisees were independent contractors. *Id.* at 735. Therefore, the only issue the court addressed was whether the essence of the franchise agreements was the franchisees' personal labor. *Id.*

Lyons argued that "the essence of the relationship between itself and its franchisees is the bilateral contract between two independent businesses, not the franchisees' personal labor." *Id.* at 736. Relying in part on *Dana's Housekeeping*, the court refused to base its decision on Lyons' characterization. *Id.* at 738-39. Instead, the court concluded that "the essence of the contracts between Lyons and its franchisees is the labor required to clean its customers' buildings." *Id.* at 739.

The court then addressed whether the personal labor was "for" Lyons or the customers:

> Lyons nevertheless maintains that the customers receive the personal labor of the franchisees. However, as the *Dana's* court concluded, labor for an employer can include both direct labor and labor for an employer's benefit. Lyons receives 15 percent of every cleaning contract. Lyons also exercises significant control over both the methods utilized by franchisees and the cleaning contracts themselves since Lyons retains ownership over every contract. Like *Dana's*, the evidence in the present case indicates that the relationship remains beneficial to Lyons, and the cleaning benefits received by Lyons' customers are not enough to exclude the franchisees from IIA coverage. We therefore find that Lyons' franchisees are "workers" under the IIA.

*Id.*

### c. *Cascade Nursing Service*

In *Cascade Nursing Service*, the issue was not whether the IIA applied but whether Cascade was liable for unemployment tax contributions. 71 Wn. App. at 27-28. Cascade's business involved referring registered nurses to medical facilities. *Id.* at 26. Cascade interviewed prospective nurses and determined whether they had certain qualifications. *Id.* The

13

No. 56929-9-II

nurses that Cascade selected signed contracts with Cascade stating that the nurses were independently self-employed. *Id.* Cascade then submitted a list of nurses to the medical facility, who selected a nurse from the list. *Id.* Cascade did not train or supervise the nurses and conducted no performance reviews. *Id.* at 27. However, Cascade negotiated the nurse's fee and also received a specified hourly rate for each hour that a nurse worked. *Id.*

The court noted that an entity is an "employer" and has to pay unemployment taxes if it has persons in "employment," which is defined under RCW 50.04.100 as "personal service" performed for wages. *Id.* at 30. The question the court addressed under RCW 50.04.100 was "whether the services performed by the nurses under contract here were clearly for Cascade or for its benefit." *Id.*

The Employment Security Department argued that Cascade received benefits from the nurses' services in the form of revenue, promotion of Cascade's business, and goodwill. *Id.* at 33. But the court concluded that this was not the type of benefit that RCW 50.04.100 contemplated. *Id.* The court stated that "the services must still be *clearly* for the employer's benefit," and stated,

> In this case, the act or acts constituting personal services are the nursing services provided by the nurses to the hospitals. Cascade does not benefit from these services, but only receives a fee for referring qualified nurses to particular facilities. In other words, Cascade is simply a scheduling and billing agent for the nurses. . . . In addition to receiving no direct benefit from the services, Cascade has no general power to direct or influence the quality of the services performed. For these reasons, we conclude that the nurses are not in the employment of Cascade pursuant to RCW 50.04.100.

*Id.* at 33.

3. Challenged Findings of Fact

DLI assigns error to findings of fact 3, 4, 6, 7, and 8. Although DLI asserts that substantial evidence does not support a few of the findings, it primarily argues that the findings

14

No. 56929-9-II

are immaterial and do not support the conclusion that the pet service providers are not Rover's "workers." We conclude that substantial evidence supports findings 3, 4 and 7, but we view finding 6 as a conclusion of law that must be reviewed de novo. And there is no question that finding 8 is a conclusion of law.

The superior court made the following findings of fact regarding the nature of the arrangement among Rover, the pet service providers, and the pet owners:

> 3. A Place for Rover, Inc. provides an electronic (Internet) platform through which pet owners and pet services providers can interact and come to an agreement for services. All services agreements are between pet owner and pet services provider. A Place for Rover, Inc. is not involved in setting price, time, scope of service, or any other matter relating to the provider's and owner's agreement.
>
> 4. A Place for Rover, Inc., the pet owners, and the pet services providers enter into an agreement before the Rover electronic platform can be used wherein A Place for Rover, Inc., the pet owners, and the pet services providers agree A Place for Rover, Inc., does not provide pet services, does not employ pet services providers, and that the pet services providers are neither employees or independent contractors of A Place for Rover, Inc.
> . . . .
>
> 7. A Place for Rover, Inc., does not provide pet services to pet owners.

AR at 7. DLI does not seriously contend that substantial evidence does not support these findings. The findings accurately reflect the undisputed evidence presented at the IAJ hearing.

Finding of fact 6 states, "The personal labor provided by the pet services providers was for the pet owners, not for A Place for Rover, Inc." AR at 7. Substantial evidence supports the first clause. But we conclude that the second clause may reflect a legal conclusion that personal labor performed for the pet owners cannot also be "for" Rover.

Finding of fact 8 states,

> 8. A Place for Rover, Inc., did not owe any industrial insurances taxes for the pet services providers for the first through fourth quarters of 2017, nor any penalties

15

No. 56929-9-II

> or interest for those time periods with regard to pet services provided to pet
> owners by pet services providers.

AR at 7-8. This "finding" clearly is a conclusion of law.

Rover focuses on the following statement in the Board's order: "The essence of the contract between Rover and the pet service provider is the use of Rover's online platform in exchange for a fee, not the personal labor of the pet service provider." AR at 6. Rover argues that this statement must be evaluated under the substantial evidence standard. But whether personal service is the essence of the contract ultimately is a question of law, not a question of fact. *See B & R Sales*, 186 Wn. App. at 376.

4. DLI's "Exemption" Argument

DLI's lead argument is that the Board erred in creating a general exemption under RCW 51.08.180 for work involving an internet platform. DLI points out that the legislature did create an exemption (now reversed) for transportation-service drivers like Uber drivers, but did not create an exemption for this type of arrangement.

But there is no indication in the Board's decision and order that the Board applied such an exemption. Instead, the Board appeared to base its ruling on the specific facts of this case, which happens to involve an internet platform. Nor does Rover argue that a general exemption should be applied here. We conclude that there is no exemption for internet platform work and that the Board did not apply such an exemption.

5. Working Under Independent Contract

As noted above, the first requirement of the definition of "worker" under former RCW 51.08.180 is that the alleged worker was working under an independent contract. *Dana's Housekeeping*, 76 Wn. App at 607; *see also Lyons Enter.*, 185 Wn.2d at 738. DLI argues that the TOS was the independent contract between Rover and the pet service providers. Rover

16

No. 56929-9-II

argues that although the TOS was a contract, the pet service providers performed no services *for Rover* under that contract. Instead, the TOS related only to use of the internet platform.

We acknowledge that this case involves a "grey area" between a person who clearly is a worker and a person who clearly is not. However, we conclude under the specific facts of this case that the pet service providers were not working under an independent contract with Rover.[3]

There is no question that the TOS is a contract between Rover and the pet service providers. The TOS expressly states that its terms are a "binding legal agreement." AR at 1326. But former RCW 51.08.180 states that a worker must be "*working under* an independent contract." (Emphasis added.) The question here is whether the pet service providers were performing work for Rover pursuant to the TOS.

Initially, we agree with DLI that it is immaterial that the TOS stated that it could not be construed as making a party the contractor of the other. The Board noted this fact in finding 4. RCW 51.04.060 precludes an employer from exempting itself by contract from the burdens of the IIA. And the Supreme Court in *Lyons Enterprises* stated that how the parties characterize a contract is not determinative of whether a contractor is a "worker." 185 Wn.2d at 738-39.

We also agree with DLI that Rover's lack of control over the pet service providers' work is immaterial regarding this factor. Rover references the fact that the alleged employer exercised control over the work in both *Dana's Housekeeping* and *Lyons Enterprises*. But in both cases the existence of an independent contract was conceded. *Dana's Housekeeping*, 76 Wn. App. at 607; *Lyons Enter.*, 185 Wn.2d at 735.

---

[3] Because of this conclusion, we do not address the other two requirements of the "worker" definition.

17

No. 56929-9-II

The parties focus on the definition of "independent contractor" found in *Black's Law Dictionary*: a person "who is entrusted to undertake a specific project but who is left free to do the assigned work and to choose the method for accomplishing it." BLACK'S LAW DICT. at 920 (11th ed. 2019). In a different context, the Supreme Court has defined an independent contractor as "a person who contracts with another to do something for [them] but who is not controlled by the other nor subject to the other's right to control with respect to [their] physical conduct in the performance of the undertaking." *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 119, 52 P.3d 472 (2002).

Here, Rover did not contract with the pet service providers to "undertake a specific project" or to "do something" for Rover. Rover did not assign particular jobs to pet service providers. In fact, there was no requirement that pet service providers do any amount of work. Instead, the TOS set forth the terms under which pet service providers could use Rover's online platform to enter into, perform, and get paid for undertaking specific projects and doing something *for pet owners*. The pet service providers were "working under independent contracts" not with Rover, but with the pet owners.

The facts here contrast with the facts in *Dana's Housekeeping* and *Lyons Enterprises*, where it was conceded that the alleged workers were independent contractors. In *Dana's Housekeeping*, Dana's agreed with its customers to clean their homes and then contracted with the housecleaners to perform that work. 76 Wn. App. at 602-03. In *Lyons Enterprises*, Lyons entered into contracts with its customers for janitorial services and then contracted with franchisees to perform those services. 185 Wn.2d at 727-28. In both cases, the alleged employers were obligated to provide certain services to third parties, and needed to contract with the alleged workers to fulfill those obligations by performing specific services.

18

No. 56929-9-II

Here, the pet owners were not Rover's customers and Rover did not agree to perform any pet care services for them. Rover had no obligations to the pet owners that it needed the pet service providers to fulfill. In other words, Rover did not need to contract with the pet service providers to perform any services for the pet owners. Consequently, unlike in *Dana's Housekeeping* and *Lyons Enterprises*, the purpose of the TOS was not to assign specific work to the pet service providers.

Instead of constituting a contract for the pet service providers to perform work for Rover, the TOS primarily sets forth the requirements for the use of its online platform. The TOS initially provides how pet service providers can register to use the platform. The remainder of the TOS provisions apply only if a pet service provider actually enters into an agreement with a pet owner to perform certain services. At that point, the pet service provider is "working under an independent contract" not with Rover, but with the pet owner.

DLI emphasizes that Rover rejects some pet service providers who apply to post on the online platform, conducts background checks that are used to exclude applicants, and can remove pet service providers from the platform based on poor performance. But these facts show that Rover exercises control over who can use its platform, not control over how the pet service providers perform their services.

We recognize that there are some provisions in the TOS that may suggest that the pet service providers are working under an independent contract. For example, Rover would become involved if a pet service provider did not show up for a job, tracked pet walkers through GPS, and could withhold compensation if the pet service provider performed deficiently. But through these provisions, Rover was providing services to the pet owners, who also had contracted with Rover through the TOS.

19

No. 56929-9-II

We conclude under the specific facts of this case that the pet service providers were not "working under an independent contract" with Rover. Therefore, we hold that the Board did not err in reversing DLI's assessment of workers' compensation taxes.

CONCLUSION

We affirm the Board's decision and order.

_____
MAXA, J.

We concur:

_____
CRUSER, A.C.J.

_____
PRICE, J.